USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/5/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DWAYNE GILMORE, et al.,

    Plaintiffs,

-against-

THE CITY OF NEW YORK,

    Defendant.

19-CV-6091 (BCM)

**MEMORANDUM AND ORDER**

**BARBARA MOSES, United States Magistrate Judge**.

The Court has received and reviewed the parties' letter-motion dated February 17, 2021 (Joint Ltr.) (Dkt. No. 89), in which they seek approval of their Settlement Agreement (Agreement) (Dkt. No. 89-1) as fair and reasonable pursuant to *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015), as well as their supplemental later dated February 26, 2021 (Supp. Ltr.) (Dkt. No. 91), submitted at the Court's request, which provides additional information and analysis concerning the fairness of the Agreement. For the reasons that follow, the Court cannot approve the Agreement as written. Consequently, the motion is DENIED without prejudice to the submission of a revised agreement that adequately addresses the issues identified herein.

## Background

Plaintiffs in this action are or were Motor Vehicle Operators at the New York City Department of Environmental Protection. Joint Ltr. at 1. They sued pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201, *et seq.*, alleging that defendant City of New York (City) failed to compensate them for "pre-shift and post-shift work" captured on the City's timekeeping system, known as CityTime; failed to compensate them for overtime work performed during unpaid meal breaks; and failed to properly calculate their regular rate of pay by failing to include "night shift and vehicle differentials." *Id.* at 2.

On January 15, 2021, the parties advised the Court that they had reached a settlement in principle (Dkt. No. 85), and on January 21, 2021, they consented to my jurisdiction pursuant to 28 U.S.C. § 646(c). (Dkt. No. 88.) Of the ten plaintiffs who filed the First Amended Complaint (Dkt. No. 23), only four are parties to the Agreement: Dwayne Gilmore, Lester Sykes, Arthur Thomas, and German Sosa. The claims of the other six were dismissed, either voluntarily or involuntarily, between March 31, 2020 and March 4, 2021.[1]

## The Agreement

The Agreement requires the City of New York (City) to pay a total of $332,178.73 to settle the claims of plaintiffs Gilmore, Sykes, Thomas, and Sosa. Ag. ¶ 2.1. Of that sum, $20,005.89 will go to plaintiffs' counsel for reimbursement of litigation expenses, *id.* ¶ 2.1(b)(iii), leaving a net settlement amount of $312,172.84.[2] The four settling plaintiffs will receive $72,178.73 (23.12%) of that amount, while $239,994.11 (76.88%) will be paid to plaintiffs' counsel, Spivak Lipton LLP (Spivak Lipton) and McGillivary Steele Elkin LLP (McGillivary), for their fees. *Id.* ¶ 2.1(a)-(c).

According to counsel, the $72,178.73 earmarked for the settling plaintiffs represents 100% of the actual damages due to Gilmore, Sykes, Thomas, and Sosa for "regular rate backpay"; 100% of the actual damages due to Gilmore, Sykes, and Thomas for "uncompensated pre- and post-shift

---

[1] Two former plaintiffs informed their counsel that they wished to withdraw from the case. The remaining four failed, at various point in the case, to respond to repeated efforts by their counsel to contact them with regard to their discovery obligations. *See* Supp. Pordy Decl. (Dkt. No. 91-1) ¶¶ 3-8. The claims of plaintiffs Rohan Balgobin, James Competelli, Salvatore Renna, Michael Moreno, and Michael Bryant were dismissed in accordance with stipulations of voluntary dismissal that were approved by the Court on various dates between March 31 and September 21, 2020. (Dkt. Nos. 37, 38, 52, 53, 72, 73.) The claims of plaintiff Rodney Taylor were dismissed pursuant to Fed. R. Civ. P. 41(b) on March 4, 2021. (Dkt. No. 92.)

[2] Notwithstanding the $20,005.89 figure in the Agreement, the declarations submitted by plaintiffs' attorneys document only $18,570.79 in expenses. *See* McGillivary Decl. (Dkt. No. 89-3) ¶ 31 & Att. A (listing $15,566.02 in expenses); Pordy Decl. (Dkt. No. 89-4) ¶ 20 & Att. A (listing $3,004.77). No invoices or other supporting documents are provided.

backpay" and "meal period backpay"; and 75% of the actual damages due to Sosa for these claims, as depicted in the following chart, prepared by counsel:

| Claim | Gilmore | Sykes | Thomas | Sosa | TOTAL |
|---|---|---|---|---|---|
| Regular Rate Backpay | $138.80 | $206.59 | $843.54 | $28.12 | $1,217.05 |
| Regular Rate Liquidated Damages | $138.80 (100%) | $206.59 (100%) | $843.54 (100%) | $28.12 (100%) | $1,217.05 |
| Uncompensated Pre- and Post-Shift Backpay | $1,335.76 | $4,730.42 | $13,987.82 | $1,085.82 (75%) | $21,139.82 |
| Uncompensated Pre- and Post-Shift Liquidated Damages | $1135.40 (85%) | $4,020.86 (85%) | $11,889.65 (85%) | $723.88 (50%) | $17,769.79 |
| Meal Period Backpay | $3,604.71 | $5,400.25 | $6,086.33 | $3,019.14 (75%) | $18,110.43 |
| Meal Period Liquidated Damages | $3,064.00 (85%) | $4,590.21 (85%) | $5,173.38 (85%) | $2,012.76 (50%) | $14,840.35 |
| TOTAL | $9,417.47 | $19,154.92 | $38,824.26 | $4,782.08 | $72,178.73 |

Joint Ltr. at 4. The settlement payment will also cover 100% of the liquidated damages due to all four settling plaintiffs for their "regular rate backpay" claims; 85% of the liquidated damages due to Gilmore, Sykes, and Thomas for their "uncompensated pre- and post-shift backpay" and "meal period backpay" claims; and 50% of the liquidated damages due to Sosa for those claims. *Id.*[3] The settlement payments do not include any prejudgment interest.

---

[3] The discounts applied to plaintiff Sosa's allocated portion of the settlement proceeds stem from his failure to produce certain documents in discovery, for which he was sanctioned on December 18, 2020. The sanctions order (Dkt. No. 82) required Sosa to sit for a resumed deposition and pay defendant's expenses, including attorneys' fees, incurred in making the sanctions motion and taking the resumed deposition. It appears that the parties settled the case before the resumed Sosa deposition could take place, at which point they agreed that the City incurred compensable attorneys' fees of $2115, and that this sum would be deducted from Sosa's settlement payment. (Dkt. No. 87.) That $2115 has been deducted, dollar-for-dollar, from the $2764 that would otherwise flow to Sosa for liquidated damages, bringing this portion of his award down to $649. Joint Ltr. at 4 n.1. The percentage discounts discussed above, however (from 100% to 75% on certain categories of actual damages, and from 85% to 50% on certain categories of liquidated damages), were applied *before* the $2115 deduction, "in consideration of [Sosa's] failure to produce certain documents related to" the discounted claims. Joint Ltr. at 5.

The Agreement states that "[t]he individual amount of backpay and liquidated damages to be awarded to each Plaintiff were calculated by Plaintiffs' Counsel based on the actual payroll records of each Plaintiff as provided by the City." Ag. ¶ 2.1(c). Plaintiffs' counsel adds that the individual allocations were based on calculations prepared by plaintiffs' damages expert and were approved by each settling plaintiff after discussions with counsel. McGillivary Decl. ¶¶ 3-5. The Agreement itself, however, is signed only by the parties' lawyers. Ag. at 11.

The $239,994.11 earmarked for the fee award to plaintiffs' attorneys is lower than their claimed lodestar of $334,159.50, *see* Joint Ltr. at 12,[4] but significantly higher than the fee contemplated by the Contingent Fee Retainer Agreement (Retainer) (Dkt. No. 91-2) between McGillivary and each settling plaintiff. In the Retainer, each client agreed to pay McGillivary and Spivak Lipton "33-1/3% (thirty-three and 1/3 percent) of my total gross recovery (inclusive of attorneys' fees recovered from defendants) as attorneys' fees." *Id*. at ECF pages 3, 5, 7, 9. Notwithstanding the phrase "total gross recovery," the Retainer clarifies that the 33-1/3% is to be calculated after counsel have been reimbursed any out-of-pocket expenses. *Id*. Applied to the settlement amount set forth in the Agreement, and crediting counsel with $20,005.89 in expenses, this formula would produce a fee award of $104,057.60 (33-1/3% of $312,172.84).

The Agreement includes a release in which the settling plaintiffs release the City and related persons "from all wage and hour claims asserted in the Lawsuit, and all federal, state and/or local statutory wage and hour claims that could have been asserted in the Lawsuit arising from the beginning of time up to and through February 17, 2021." Ag. ¶ 3.1. There is no confidentiality or non-disparagement clause.

---

[4] The "lodestar" is "the product of a reasonable hourly rate and the reasonable number of hours required by the case." *Millea v. Metro-North R.R. Co.,* 658 F.3d 154, 166 (2d Cir. 2011).

### **Standards**

In light of the "unique policy considerations" underlying the FLSA, "stipulated dismissals settling FLSA claims with prejudice require the approval of the district court or the [Department of Labor] to take effect." *Cheeks*, 796 F.3d at 206 (noting the "potential for abuse" flowing from "highly restrictive confidentiality provisions," overbroad releases, and fee provisions that benefit plaintiffs' attorneys at the expense of plaintiffs themselves). The purpose of the judicial review process is to ensure "that the agreement is fair and reasonable to the plaintiff." *Seck v. Dipna Rx, Inc.*, 2017 WL 1906887, at *3 (S.D.N.Y. May 8, 2017).

Because *Cheeks* itself "did not define the contours of the approval analysis or protocols it envisioned," most district courts within the Second Circuit turn to the multi-factor test set out in *Wolinsky v. Scholastic Inc.,* 900 F. Supp. 3d 332 (S.D.N.Y. 2012), "to evaluate whether an FLSA wage and hour settlement [is] 'fair and reasonable.'" *Li Rong Gao v. Perfect Team Corp.*, 249 F. Supp. 3d 636, 638 (E.D.N.Y. 2017); *see also Fisher v. SD Prot., Inc.* 948 F.3d 593, 599-600 (2d Cir. 2020) ("District courts typically evaluate the fairness of a settlement agreement by considering the factors outlined in *Wolinsky* . . ."). *Wolinsky* teaches that "a court should consider the totality of the circumstances, including but not limited to the following factors: (1) the plaintiff's range of possible recovery; (2) the extent to which 'the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses'; (3) the seriousness of the litigation risks faced by the parties; (4) whether 'the settlement agreement is the product of arm's-length bargaining between experienced counsel'; and (5) the possibility of fraud or collusion." 900 F. Supp. 2d at 335 (quoting *Medley v. Am. Cancer Soc.*, 2010 WL 3000028, at *1 (S.D.N.Y. July 23, 2010)).

Where a proposed settlement of FLSA claims includes the payment of attorneys' fees, the court must also assess the fairness of the fee allocation. *Fisher*, 948 F.3d at 600; *Wolinsky*, 900 F. Supp. 2d at 336. The "most critical factor" in determining whether the proposed fee is fair is "the degree of success obtained." *Fisher*, 948 F.3d at 606 (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)). Although the reviewing court may consider the relationship between the amount going to the plaintiffs and the amount going to their lawyers, *id*. at 603, it may not "presum[e]" that fees should be capped at a pre-set percentage of the total settlement amount, nor "us[e] proportionality as an outcome determinative factor" in evaluating the reasonableness of the proposed fee. *Id*. at 602-03 (noting that a percentage cap could "discourag[e] plaintiffs' attorneys from taking on 'run of the mill' FLSA cases where the potential damages are low and the risk of protracted litigation high"). If the court concludes that the proposed fee allocation (or any other aspect of the settlement) is unreasonable or unfair to the plaintiffs, its "options are to (1) accept the proposed settlement; (2) reject the proposed settlement and delay proceedings to see if a different settlement can be achieved; or (3) proceed with litigation." *Id*. at 606. The Court "may not simply rewrite" the parties' agreement. *Id*. at 599, 605.

## **Analysis**

In this case, the overall settlement amount of $332,178.73 is fair and reasonable to the plaintiffs in light of the first three *Wolinsky* factors. In addition, the Court is satisfied that the Agreement was the product of arm's-length bargaining between experienced counsel, and has no concerns regarding fraud or collusion. The non-economic terms of the Agreement are also fair and reasonable. However, as noted above, the $20,005.89 identified as expense reimbursement is insufficiently supported. *See Fisher*, 948 F.3d at 600 ("The fee applicant must submit adequate documentation supporting the requested attorneys' fees and costs.").

The proposed fee allocation is also problematic – not because it exceeds a judge-made "percentage cap" but because it is more than twice the contingency fee that plaintiffs' counsel agreed to accept when plaintiffs retained them. The Retainer states, in relevant part:

> In consideration of the services of [McGillivary], and such other law firms with whom they deem necessary to work on my case such as Spivak Lipton, LLP of New York City, I agree to pay such attorneys 33-1/3% (thirty-three and 1/3 percent) of my total gross recovery (inclusive of attorneys' fees recovered from defendants) as attorneys' fees. In the event that [McGillivary] recovers attorneys' fees from the defendants in this action, and such fees equal or exceed the contingent fee, I will not be assessed any attorneys' fees. If the complaint brought on my behalf results in no recovery, I will have no obligation to pay attorneys' fees.

While the reference to counsel "recover[ing] attorneys' fees from the defendants in this action" is not crystal clear, that clause suggests that if counsel were to obtain a fee award after plaintiffs were awarded all damages due to them – for example, by means of a fee motion made after trial – counsel would not be limited to one-third of the "total gross recovery." In this case, however, the parties negotiated a global settlement, the proceeds of which must be shared by plaintiffs and their lawyers. In this context, plaintiffs had every reason to believe – based on the plain language of the Retainer – that their lawyers' share would be limited to the contingency fee set forth therein.

A contingency fee agreement, like a settlement agreement, "is a contract that is interpreted according to general principles of contract law.'" *Fisher*, 948 F.3d at 605 (quoting *Omega Engineering, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005)). Unless terminated or modified by the parties, it continues to bind them even when (perhaps especially when) the underlying case is settled. *See*, *e.g.*, *Cromer Fin. Ltd. v. Berger*, 2003 WL 203197, at *2 n.5 (S.D.N.Y. Jan. 29, 2003) (noting that under law firm's retainer agreements with its clients, firm would be required to return a portion of its fee award to those clients); *Villa Clemente v. Midtown E. NY LLC*, 2020 WL 5913595, at *3 (S.D.N.Y. Oct. 6, 2020) (approving FLSA settlement including a one-third fee award that was "consistent with the Firm's retainer" and lower than its lodestar).

Here, the parties (and plaintiffs' counsel) may well view the Agreement as modifying the Retainer. However, given that the FLSA is "a uniquely protective statute," *Cheeks*, 796 F.3d at 207, and that one of the abuses it aims to protect workers against is excessive fees charged by their own attorneys, *see id*. at 206 (listing, as an example of "the potential for abuse in such settlements," a case where the settlement agreement set the fee for plaintiff's attorney at "between 40 and 43.6 percent of the total settlement payment" without adequate documentation), a reviewing court can and should consider, when evaluating the fairness of an FLSA settlement, whether the fee allocation is consistent with the terms on which plaintiffs reasonably expected their attorneys to be compensated. In this case, as noted above, it is not: the Agreement allocates almost 77% of the total gross recovery (as defined in the Retainer) to counsel, rather than the 33-1/3% contingency to which counsel originally agreed.

It is true, as the parties point out, that the fees sought by plaintiffs' counsel are lower (by about 28%) than their claimed lodestar, Joint Ltr. at 11, which would be the starting point for a fee award made after trial. *See*, *e.g.*, *Williams v. Epic Sec. Corp.*, 368 F. Supp. 3d 651, 656 (S.D.N.Y. 2019). However, this case did not go to trial. Instead, the parties negotiated a global settlement in which every dollar allocated to plaintiffs' attorneys is a dollar that does not go to plaintiffs (and *vice versa*).[5] Moreover, nothing in the Retainer suggested that plaintiffs' counsel would seek fees

---

[5] "Attorneys' fees and costs in FLSA actions generally arise in three contexts: (1) fee applications following a ruling in favor of plaintiff, *see, e.g.*, *Choudry v. Durrani*, No. 14-cv-4562 (SIL), 2016 WL 6651319, at *8 (E.D.N.Y. Nov. 10, 2016) (prevailing plaintiff granted leave to file an application for attorneys' fees and costs after successful bench trial); (2) fee applications following a settlement where the settlement agreement reserves the questions of fees and costs for the court to decide, *see, e.g.*, *Boutros v. JTC Painting & Decorating Corp.*, No. 12-cv-7576 (PAE), 2014 WL 3925281, at *1 (S.D.N.Y. Aug. 8, 2014) (reviewing fee application resulting from parties' disagreement over fees paid to plaintiff's counsel in FLSA settlement); and (3) settlements incorporating attorneys' fees and costs into the settlement amount, *see, e.g.*, *Lopez v. Nights of Cabiria, LLC*, 96 F. Supp. 3d 170, 181-82 (S.D.N.Y. 2015) (reviewing FLSA settlement incorporating counsel's fees as part of the total settlement amount)." *Fisher*, 948 F.3d at 600-01. In the

on an hourly basis (or, for that matter, disclosed their hourly rates). The fact that plaintiffs' lodestar calculation produces a "negative multiplier," Supp. Ltr. at 2, thus cannot be sufficient, standing alone, to render the fee allocation fair and reasonable. [6]

It is also true, as the parties note, that the Agreement provides a robust recovery for plaintiffs, which counsel calculate as 93% of the "total possible recovery" for Gilmore, Sykes, and Thomas, and 31% of the total possible recovery for Sosa. Joint Ltr. at 8. The Court agrees that this degree of success is "significant," *id.*, and exceeds the outcome in many, if not most, settled FLSA cases. In a multi-plaintiff case, however, courts appropriately evaluate the "degree of success" obtained against the entire plaintiff group, not just those who ultimately became "prevailing" plaintiffs. *See Williams*, 368 F. Supp. 3d at 660-61 (reducing fee award after trial, where plaintiffs

---

first two scenarios, fees awarded to counsel do not reduce the damages or settlement proceeds available to plaintiffs. This case, however, "involves the third scenario." *Id*. at 601.

[6] I note as well that counsel's time records (*see* McGillivary Decl. Att. A; Pordy Decl. Att. A) reflect work performed by eleven separate timekeepers, at rates from $195 to $600 per hour, including work performed on behalf of the former plaintiffs, who are not "prevailing plaintiffs" and therefore are not entitled to fees under 29 U.S.C. § 216(b). *Williams*, 368 F. Supp. 3d at 660. Were the Court to perform a classic lodestar analysis – as typically occurs in the context of a fee motion after trial or default – the lodestar calculated by plaintiffs' counsel would undoubtedly be reduced. *See*, *e.g.*, *Jianmin Jin v. Shanghai Original, Inc.*, 2020 WL 4783399 (E.D.N.Y. Aug. 18, 2020) (reducing $211,075 fee request after trial to $31,482 after lowering lead counsel's hourly rate from $550 to $375, excluding time spent on litigation efforts that were "abandoned midstream," and applying a further across-the-board discount for "poor billing practices"); *Dacas v. Duhaney*, 2020 WL 4587343 (E.D.N.Y. June 18, 2020) (reducing $33,120 fee request to $15,126 after lowering lead counsel's hourly rate from $625 to $400 and trimming a further 30% "to account for vague, duplicative, and excessive hours billed"), *report and recommendation adopted,* 2020 WL 4586371 (E.D.N.Y. Aug. 10, 2020); *Williams*, 368 F. Supp. 3d at 660 (approving $600 hourly rate for lead counsel but reducing $414,720 fee request to $116,225 after lowering hourly rates of other attorneys and steeply discounting the compensable hours because only 23 of the 38 plaintiffs went to trial, and only "17 of them (45% of the total group (*i.e.*, 17 out of 38)) were prevailing parties"); *Boutros*, 2014 WL 3925281, at *5, 8 (disallowing "the time spent interviewing plaintiffs other than Boutros and Zuniga," because "those other plaintiffs never became parties to this case" and therefore were not "prevailing parties" entitled to fees).

collectively won almost $90,000, because only 17 of the 38 total plaintiffs "were prevailing parties"). Moreover, while three of the four prevailing plaintiffs here will recover *most* of the damages they seek, none of them will recover *all* of the actual and liquidated damages to which they would be entitled, should they prevail at trial, over the three-year limitations period applicable to willful FLSA violations. *See* 29 U.S.C. § 255 (a). Nor will they receive prejudgment interest on the backpay awards, as they would in court.

In *Fisher*, the Second Circuit suggested that, in the settlement context, the trial court need no longer concern itself about what appears to be an excessive fee award to plaintiffs' counsel when – and only when – plaintiffs have achieved "complete success." 948 F.3d at 607. In that case, out of the total settlement proceeds of $25,000, the parties proposed to allocate $2,000 to the plaintiff and $23,000 to his attorneys – which was considerably less than counsel's $50,000 lodestar but "understandably gave the district court pause." *Id.* at 606. Rather than simply reject the proposed settlement, however, the district court capped counsel's fees at 33% based on a "policy" under which that was "maximum fee percentage" which could be approved in FLSA cases, modified the proposed settlement by reducing the fee award to 33% and shifting the excess from counsel to client, and approved the settlement as so modified. *Id*. at 599. Holding that the district court erred, both in applying a cap and in modifying the parties' settlement contract, the Second Circuit vacated and remanded, specifically directing the court below to:

> . . . take into account that an award of $11,170 would give Fisher complete recovery in this litigation. If Fisher were to be awarded $11,170, LLG [plaintiff's counsel] would have achieved complete success by obtaining 100% of Fisher's possible overtime wages and statutory damages under the FLSA and NYLL.

*Id*. at 607. Unsurprisingly, on remand, the parties negotiated, and the district court approved, a new $25,000 settlement which allocated $11,170 ("complete success") to plaintiff Fisher, $4,733.60 to LLG to reimburse its expenses, and $9,096.40 to LLG for its fee. *See* Decision and

10

Order Approving Settlement, *Fisher v. SD Protection Inc., et al.*, No. 17-CV-2229 (RMB), ECF No. 116 (S.D.N.Y. June 4, 2020), ¶¶ 3-5.

Here, plaintiffs' attorneys propose to collect a fee which is not only three times the amount going to their clients in settlement; it is more than twice the amount contemplated by the Retainer (and could well prove, after analysis, to be higher than their lodestar with respect to the claims of the four prevailing plaintiffs). Although the result obtained for those plaintiffs was good, the split gives me pause – particularly in the context of a global settlement that leaves plaintiffs themselves with less than "complete success" on their FLSA claims.

## Conclusion

The parties' motion for approval of their proposed settlement (Dkt. No. 89) is DENIED without prejudice to renewal should they submit a revised agreement that does not ask the prevailing plaintiffs to accept less than complete success while their attorneys receive more than the contingency fee for which they contracted.[7] Any renewed settlement approval motion shall be filed within 30 days of today's date and shall include supporting documentation for all expenses (other than court fees) for which reimbursement is sought. If during that period the parties are unable to negotiate a revised agreement, they shall file a status report advising the Court as to what remains to be done before trial.

Dated: New York, New York
      March 5, 2021                       **SO ORDERED**.

                                                **BARBARA MOSES**
                                                **United States Magistrate Judge**

---

[7] In the case of plaintiff Sosa, "complete success" should not relieve him of his obligation to pay the discovery sanctions assessed by this Court.